IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| FRANCES VANESSA KINCHEN,<br>      Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:16cv55 (JAG) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
|      Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

On July 12, 2010, Frances Vanessa Kinchen ("Plaintiff") applied for Social Security Disability Benefits ("DIB"), alleging disability from severe hypertension, depression and bipolar disorder, with an alleged onset date of April 14, 2009. The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the Appeals Council granted Plaintiff's request for review. The Appeals Council remanded the claim for a new hearing and decision. An ALJ again denied Plaintiff's claims in a written decision, and the Appeals Council denied Plaintiff's second request for review, rendering the ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in failing to give controlling weight to her treating physician's opinion. (Mem. in Support of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 9) at 15-20.) Plaintiff further argues that the ALJ erred in failing to properly evaluate Plaintiff's credibility. (Pl.'s Mem. at 20-22.) Finally, Plaintiff argues that the ALJ erred in failing to adequately

consider Plaintiff's obesity. (Pl.'s Mem. at 22-24.)  This matter now comes before the Court for

a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-

motions for summary judgment and Plaintiff's motion for remand, rendering the matter now ripe

for review.[1]  For the reasons that follow, the Court recommends that Plaintiff's Motion for

Summary Judgment (ECF No. 7) and Plaintiff's Motion for Remand (ECF No. 8) be DENIED,

that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED and that the final

decision of the Commissioner be AFFIRMED.

## I.      PROCEDURAL HISTORY

On July 12, 2010, Plaintiff filed an application for DIB with an alleged onset date of

April 14, 2009.  (R. at 330-38.)  The SSA denied these claims initially on January 7, 2011, and

again upon reconsideration on April 13, 2011.  (R. at 184-88, 190-92.)  At Plaintiff's written

request, the ALJ held a hearing on July 31, 2012.  (R. at 69-89, 193-94.)  On August 9, 2012, the

ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not

qualify as disabled under the Act, because she could perform jobs that exist in significant

numbers in the national economy.  (R. at 163-78.)  On October 17, 2013, the Appeals Council

granted Plaintiff's request for review and remanded the claim for a new hearing and decision.

(R. at 179-83.)  A second ALJ held a hearing on March 7, 2014.  (R. at 90-134.)  On June 27,

2014, the ALJ again denied Plaintiff's claims in a written decision, and the Appeals Council

denied Plaintiff's second request for review, rendering the ALJ's decision as the final decision of

the Commissioner subject to review by this Court.  (R. at 1-4, 46-59.)

---

[1]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the

Social Security Administration's disability determination 'when an ALJ has applied correct legal

standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v.*

*Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a

preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as

adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig*

*v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  To determine whether substantial evidence exists,

the court must examine the record as a whole, but may not "undertake to re-weigh conflicting

evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]."

*Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  In

considering the decision of the Commissioner based on the record as a whole, the court must

"take into account whatever in the record fairly detracts from its weight." *Breeden v.*

*Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*,

340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence

in the record supports the findings, bind the reviewing court to affirm regardless of whether the

court disagrees with such findings. *Hancock*, 667 F.3d at 477.  If substantial evidence in the

record does not support the ALJ's determination or if the ALJ has made an error of law, the court

must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the

agency employs to determine whether disability exists. 20 C.F.R. § 416.920(a)(4); *see Mascio*,

780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation).  To summarize, at step

one, the ALJ looks at the claimant's current work activity. 20 C.F.R. § 416.920(a)(4)(i). At step

two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and

duration requirements. 20 C.F.R. § 416.920(a)(4)(ii). Step three requires the ALJ to determine

whether the medical impairments meet or equal an impairment listed in the regulations. 20

C.F.R. § 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's

residual functional capacity ("RFC"), accounting for the most that the claimant can do despite

her physical and mental limitations. 20 C.F.R. § 416.945(a). At step four, the ALJ assesses

whether the claimant can perform her past work given her RFC. 20 C.F.R. § 416.920(a)(4)(iv).

Finally, at step five, the ALJ determines whether the claimant can perform any work existing in

the national economy. 20 C.F.R. § 416.920(a)(4)(v).

### III.    THE ALJ'S DECISION

On March 7, 2014, the ALJ held a hearing during which Plaintiff (represented by

counsel) and a VE testified. (R. at 90-134.) On June 27, 2014, the ALJ issued a written opinion,

finding that Plaintiff did not qualify as disabled under the Act. (R. at 46-59.)

The ALJ followed the five-step evaluation process established by the Social Security Act

in analyzing Plaintiff's disability claim. (R. at 46-59.) At step one, the ALJ found that Plaintiff

had not engaged in substantial gainful activity since April 14, 2009. (R. at 51.) At step two, the

ALJ found that Plaintiff had the following severe impairments: hypertension, atrial-septal defect

of the heart with murmur and palpitations, obesity, bipolar disorder and post-traumatic stress

disorder. (R. at 51.) At step three, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525,

404.1526. (R. at 51-53.)

4

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work as defined in 20 C.F.R § 404.1567(b) with certain exceptions. (R. at 53-57.) Specifically, the ALJ found that Plaintiff could sit for six hours and stand and/or walk for six hours during an eight-hour workday, but that she must alternate between sitting and standing in place every thirty minutes. (R. at 53.) Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 53.) Plaintiff could never climb ladders, ropes or scaffolds, and she must avoid all exposure to hazards including dangerous machinery and heights. (R. at 53.) Plaintiff must also avoid all exposure to temperature extremes and pulmonary irritants. (R. at 53.) Plaintiff could perform unskilled, non-production oriented work that involved no interaction with the public and only occasional interaction with co-workers and supervisors. (R. at 53.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (R. at 57-58.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 58-59.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 59.)

## IV.   ANALYSIS

Plaintiff, thirty-nine years old at the time of this Report and Recommendation, previously worked as a certified nursing assistant. (R. at 125-27, 332, 372, 389-94.) She has also held positions as a cashier and convenience store clerk. (R. at 125-27, 372, 389-94.) Plaintiff applied for Social Security Benefits, alleging disability from severe hypertension, depression and bipolar disorder, with an alleged onset date of April 14, 2009. (R. at 330-38, 371.) Plaintiff's appeal to this Court argues that the ALJ erred in failing to give controlling weight to the opinion of her treating physician. (Pl.'s Mem. at 15-20.) Plaintiff further argues that the ALJ erred in failing to properly evaluate Plaintiff's credibility. (Pl.'s Mem. at 20-22.) Finally, Plaintiff argues that the

ALJ erred in failing to adequately consider Plaintiff's obesity. (Pl.'s Mem. at 22-24.) For the reasons set forth below, the ALJ did not err in her decision.

### A. Substantial Evidence Supports the ALJ's Assignment of Weight to Dr. Spencer's Opinion Regarding Plaintiff's Physical Limitations.

Plaintiff argues that the ALJ erred in failing to properly assign adequate weight to the opinion of her treating physician, Beverly Spencer, M.D. (Pl.'s Mem. at 15-19). Specifically, Plaintiff argues that the ALJ failed to sufficiently explain which evidence from the record that she found inconsistent with Dr. Spencer's opinion. (Pl.'s Mem. at 17.) Defendant responds that Dr. Spencer's opinion lacked support from the overall record, so the ALJ reasonably assigned it little weight. (Def.'s Mot. for Summ. J. & Br. in Support ("Def.'s Mem.") (ECF No. 10) at 14.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 404.1527, 416.912(a)-(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that comport with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions conflict internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

Under the applicable regulations and case law, a treating source's opinion deserves controlling weight if it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and does not conflict with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Craig*, 76 F.3d at 590; SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant suffers from a disability for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion lacks consistency with other evidence or when it otherwise lacks support. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistencies.'" *Dunn v. Colvin*, 607 F. App'x. 264, 267 (4th Cir. 2015) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should remain untouched unless the ALJ failed to give a sufficient reason for the weight afforded. 20 C.F.R. § 404.1527(d).

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant qualifies as disabled as the Act defines that term. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may apply in evaluating opinion evidence from "other sources." SSR 06-03p.

7

Here, the ALJ considered Dr. Spencer's opinion in light of objective medical evidence and Plaintiff's subjective complaints. On June 14, 2012, Dr. Spencer diagnosed Plaintiff with hypertension, palpitations, heart murmur and atrial septal defect. (R. at 56, 833.) Dr. Spencer identified Plaintiff's prognosis as "good," and opined that Plaintiff could sit for eight hours, but only stand or walk for one to two hours during an eight-hour workday. (R. at 56, 833-835.) Plaintiff could occasionally lift and carry up to twenty pounds, but she needed to avoid temperature extremes. (R. at 56, 835-37.) Dr. Spencer opined that Plaintiff's impairments would likely cause her to miss work two to three times per month. (R. at 833, 836.) The ALJ's assessment differed from Dr. Spencer's opinion in two ways. First, the ALJ concluded that Plaintiff could stand and/or walk for six hours in an eight-hour day, four to five more hours than Dr. Spencer opined. (R. at 53, 835.) Second, the ALJ did not find that Plaintiff would miss work two to three times per month due to her impairments. (R. at 53, 836.) Ultimately, the ALJ afforded little weight to Dr. Spencer's opinion, because the overall record did not support it. (R. at 56.) Substantial evidence supports the ALJ's decision.

    i. Internal Inconsistencies Exist Between Dr. Spencer's Opinion and Her Own Evaluation of Plaintiff.

The inconsistency of Dr. Spencer's opinion with her own evaluation of Plaintiff supports the ALJ's assignment of weight. On February 6, 2012, Dr. Spencer conducted a physical evaluation of Plaintiff. (R. at 736-39.) Four months later, Dr. Spencer issued her opinion and diagnosis of Plaintiff based on that and previous evaluations. (R. at 833-38.) During the February evaluation, Dr. Spencer noted that Plaintiff had "been doing fairly well," and indicated that Plaintiff had not recently undergone any lab work, imaging studies or tests. (R. at 736.) Dr. Spencer limited Plaintiff's ability to stand and walk to one to two hours in an eight-hour day, yet Plaintiff had denied any back, joint or muscle pain, muscle cramps or weakness. (R. at 738,

8

835.) Moreover, Plaintiff denied any tenderness, and Dr. Spencer found no swelling of Plaintiff's upper or lower extremities. (R. at 739.) In fact, Dr. Spencer instructed Plaintiff to exercise on a daily basis, consistent with recommendations from other doctors and medical professionals. (R. at 739, 863, 869, 924, 964, 1039.)

Finally, Dr. Spencer premised her diagnosis on Plaintiff's subjective complaints of chest pain, shortness of breath, fatigue, palpitations and dizziness, as well as an unspecified edema; however, Plaintiff had denied any dizziness, fatigue or difficulty sleeping during her evaluation. (R. at 736-38, 833, 837.) On June 27, 2013, Plaintiff similarly denied the aforementioned symptoms, indicating neither limited mobility nor fatigue. (R. at 794-98.) Once again, Dr. Spencer instructed Plaintiff to exercise on a daily basis. (R. at 797.)

In the absence of clinical evidence or laboratory diagnostic findings firmly supporting Dr. Spencer's opinion regarding Plaintiff's limitations, the ALJ reasonably assigned little weight to Dr. Spencer's opinion. *See Craig*, 76 F.3d at 590 (noting that a physician's opinion not supported by clinical evidence or laboratory test results, or otherwise inconsistent with other substantial evidence, should be accorded significantly less weight). Accordingly, the inconsistencies between Dr. Spencer's evaluation and opinion of Plaintiff support the ALJ's decision to afford Dr. Spencer's opinion little weight.

      ii.    Dr. Spencer's Opinion Does Not Comport with the Objective Medical Evidence of Record.

Inconsistencies between Dr. Spencer's opinion and objective medical evidence in the record also support the ALJ's assignment of little weight to that opinion. On November 30, 2011, Fitzgerald Marcelin, M.D., noted that Plaintiff had a normal heart rate and respiration, and no soft tissue swelling, heart murmurs or cardiac edemas. (R. at 898.) On January 30, 2012, Mary Davis, F.N.P., conducted a physical examination, which revealed a normal heart rate and

no cardiac edemas.  (R. at 896-97.)  Plaintiff's medications controlled her hypertension, and she denied chest pain and shortness of breath.  (R. at 896-97.)

On September 16, 2012, Nabeel Mohamed, M.D., noted that Plaintiff's subjective complaint of chest pain likely related to gastrointestinal issues, and he found no edema in her lower extremities.  (R. at 768-69.)  On October 4, 2012, Plaintiff underwent a cardiac catherization after which Kimberly Haberlin, N.P., reported that Plaintiff "[was] doing well." (R. at 963, 969.)  The procedure revealed normal results, and Nurse Haberlin discharged Plaintiff with instructions to exercise daily, follow a heart healthy diet and follow up with her cardiologist.  (R. at 963-65.)

On April 22, 2013, Plaintiff saw Rahul Wadnerkar, M.D., who observed that Plaintiff had a regular heartbeat, unlabored breathing and grossly normal extremities with "no appreciated pain."  (R. at 774-76.)  On May 15, 2013, Anthony Adams, M.D., conducted a physical examination of Plaintiff, which revealed no cardiac edema, palpitations or murmur.  (R. at 783-84, 786.)  Plaintiff denied heart palpitations or shortness of breath, and Dr. Adams reported no extremity swelling or calf tenderness.  (R. at 784-86.)  Dr. Adams found no lower extremity pain or swelling, and Plaintiff denied shortness of breath and palpitations.  (R. at 783-84.)  On June 27, 2013, Dr. Spencer deemed Plaintiff as low risk from a cardiac standpoint for bariatric surgery. (R. at 799.)

Finally, on October 23, 2013, December 9, 2013, January 10, 2014, and January 23, 2014, Zheni Avram, M.D., examined Plaintiff, and each time Dr. Avram noted Plaintiff's normal heart rate and the absence of any heart palpitations or murmurs.  (R. at 840-49.)  Plaintiff denied chest pain or discomfort and dizziness during each examination.  (R. at 840-48.)  In sum, the observations and notations of eight other medical professionals who examined Plaintiff do not

10

comport with Dr. Spencer's ultimate opinion on Plaintiff's limitations. Thus, objective medical evidence in the record supports the ALJ's decision to afford little weight to Dr. Spencer's opinion.

        iii.    Dr. Spencer's Opinion Does Not Comport with Plaintiff's Own Subjective Complaints.

Plaintiff's own subjective complaints also support the ALJ's assignment of little weight to Dr. Spencer's opinion. Between June 2, 2009 and April 9, 2014, Plaintiff presented to various medical professionals at Dinwiddie Medical Center dozens of times for routine care, medication refill requests and specific medical complaints. (R. at 750, 839-926, 1037-44.) As part of those visits, medical professionals conducted more than thirty physical examinations of Plaintiff. (R. at 840-50, 856-58, 861, 863-84, 867, 870-71, 873-74, 879, 881-82, 884, 887, 890, 893, 896, 898, 900-02, 905, 908-10, 912, 914, 916-18, 920, 922-23, 925, 1037, 1041.) During that nearly five-year time period, Plaintiff expressly denied having chest pain, shortness of breath or other cardiovascular symptoms during all but two examinations. (R. at 883-86, 918-20.) Plaintiff once indicated experiencing shortness of breath when around smoke or when engaged in substantial activity, but her shortness of breath subsided once she removed herself from the smoke or discontinued her activity. (R. at 923.) Plaintiff presented with a normal heart rate during each examination and complained of leg swelling only three times. (R. at 884, 923, 925.) During each instance of swelling, however, Plaintiff acknowledged noncompliance with her medication and/or other medical recommendations. (R. at 884, 923, 925.)

Moreover, between October 18, 2010 and June 27, 2013, Dr. Spencer examined Plaintiff on six occasions, during which Plaintiff's subjective complaints did not rise to the level of limitation articulated by Dr. Spencer. (R. at 709, 718, 723, 727, 736, 794.) On January 24, 2011, Plaintiff indicated mild to moderate chest discomfort and shortness of breath. (R. at 723.)

11

On February 17, 2011, just three weeks later, Plaintiff denied any shortness of breath or palpitations. (R. at 1007.) In fact, Plaintiff stated that her shortness of breath had "markedly improved." (R. at 1007.) Only once did Plaintiff complain of muscle pain or numbness. (R. at 711.) Plaintiff otherwise denied any back, joint or muscle pain, muscle cramps, weakness, numbness or lower extremity swelling. (R. at 711-12, 720-21, 725-26, 728-30, 738-39, 796-97.) At the conclusion of each examination, Dr. Spencer instructed Plaintiff to exercise daily, which Plaintiff consistently failed to do. (R. at 713, 722, 726, 730, 739, 794, 797, 898-99.) Thus, Plaintiff's subjective complaints support the ALJ's decision to afford little weight to Dr. Spencer's opinion.

The record fails to reveal that the ALJ "dredged up [any] 'specious inconsistencies'" that would lead the Court to disturb the ALJ's assignment of weight to Dr. Spencer's opinion. *Dunn*, 607 F. App'x. at 267 (quoting *Scivally*, 966 F.2d at 1077). Rather, the inconsistencies between Dr. Spencer's opinion and her own evaluations, objective medical evidence and Plaintiff's subjective complaints appear throughout the record. Accordingly, substantial evidence supports the ALJ's decision to afford little weight to Dr. Spencer's opinion.

**B. Substantial Evidence Supports the RFC assessment by the ALJ.**

Tacked on to her argument that Dr. Spencer's opinion deserved more weight, Plaintiff also argues that the ALJ erred in failing to identify specific evidence and medical facts supporting her RFC determination. (Pl.'s Mem. at 19-20.) Defendant responds that the ALJ identified "ample evidentiary support" for the RFC. (Def.'s Mem. at 13.) As explained below, substantial evidence supports the ALJ's RFC assessment.

The RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments that are based on the claimant's credible complaints.

12

*Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* 20 C.F.R.

§ 416.945(e).  Social Security Ruling 96-8p instructs that the RFC "assessment must first

identify the individual's functional limitations or restrictions and assess his or her work-related

abilities on a function-by-function basis, including the functions listed in the regulations."

*Mascio*, 780 F.3d at 636 (citing SSR 96-8p).  The RFC "assessment must include a narrative

discussion describing how the evidence supports each conclusion, citing specific medical facts

(*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." *Id.*

(citing SSR 96-8p).

In this case, the ALJ determined that Plaintiff could perform light work with additional

limitations.  (R. at 53.)  Specifically, Plaintiff could stand or walk for six hours during an eight-

hour workday, but she had to alternate between sitting and standing every thirty minutes.  (R. at

53.)  Plaintiff could occasionally climb ramps and stairs, but she had to avoid all exposure to

hazards including dangerous machinery and heights.  (R. at 53.)  She also had to avoid all

exposure to temperature extremes and pulmonary irritants.  (R. at 53.)  Finally, the ALJ

concluded that Plaintiff could perform unskilled, non-production oriented work that involved no

interaction with the public and only occasional interaction with co-workers.  (R. at 53.)  Contrary

to Plaintiff's assertion, the ALJ cited myriad specific facts that support the RFC determination.

The ALJ included a detailed discussion outlining specific examination findings,

Plaintiff's treatment history, diagnostic studies and testimony that supported her determination.

(R. at 53-57.)  Specifically, the ALJ recognized that Plaintiff's examinations over the relevant

time period revealed unremarkable results.  (R. at 53-57.)  Plaintiff often denied chest pain,

shortness of breath or other physical ailments during examinations.  (R. at 53-57, 598, 840-49,

896-97, 963.)  When Plaintiff did experience negative symptoms, the ALJ noted that they often

13

occurred due to noncompliance with her medications and/or failure to adopt recommended lifestyle changes. (R. at 54-55.) The ALJ also pointed to specific instances in the record when Plaintiff's symptoms improved with medication compliance. (R. at 55, 494, 511, 898.)

Additionally, the ALJ discussed Plaintiff's treatment history, noting its conservative nature based on Plaintiff's prescription medications and recommended lifestyle changes. (R. at 57.) The ALJ also discussed numerous diagnostic findings that contradicted the level of symptom severity alleged by Plaintiff. (R. at 53-57.) Specifically, the ALJ noted an electromyogram and nerve conduction study that showed a normal upper left extremity. (R. at 55, 682-82.) Moreover, an echocardiogram revealed the absence of intracardiac shunting, and Plaintiff reported no chest pain during a stress test. (R. at 55-56, 733-34, 759.) Finally, the ALJ discussed Plaintiff's own testimony and a third-party statement, both of which revealed Plaintiff's ability to carry out her daily activities with little limitation. (R. at 54, 57, 98-125, 378-88.)

Ultimately, the ALJ concluded that the record failed to reveal impairments of such severity or frequency that would preclude Plaintiff from all levels of work. (R. at 57.) In reaching her determination, the ALJ discounted Plaintiff's credibility as to the severity of her symptoms (as discussed in detail below) due to objective medical findings, the conservative nature of her treatment and her admitted daily activities. (R. at 57.) The ALJ properly cited specific medical facts (*e.g.*, results from an electromyogram, an echocardiogram and a stress test) and nonmedical evidence (*e.g.*, Plaintiff's social interactions and admitted daily activities), sufficiently describing how such facts and evidence supported the RFC. *Mascio*, 780 F.3d at 636 (citing SSR 96-8p). Consequently, substantial evidence supports the RFC assessment.

14

**C. Substantial Evidence Supports the ALJ's Decision to Diminish Plaintiff's Credibility.**

Plaintiff next argues that the ALJ erred in failing to properly evaluate Plaintiff's credibility. (Pl.'s Mem. at 20.)  Specifically, Plaintiff argues that the ALJ's credibility determination lacked sufficient explanation, and that substantial evidence does not support it. (Pl.'s Mem. at 20-22.)  Defendant responds that the ALJ properly analyzed Plaintiff's credibility in accordance with the regulations, and that substantial evidence supports his analysis. (Def.'s Mem. at 16.)  For the reasons that follow, the ALJ did not err in evaluating Plaintiff's credibility.

In the determining the RFC, the ALJ must incorporate those impairments that have basis in the claimant's credible complaints. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1).  In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a).  During the first step, the ALJ determines the existence of an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3.  The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added).  If the underlying impairment reasonably could be expected to produce the individual's pain, then the second step of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595.  Yet again, the ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific

15

reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.[2]

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

It is appropriate for an ALJ to consider medication and treatment used to alleviate a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(v). If the claimant requires only

---

[2]     On March 16, 2016, the Agency issued SSR 16-3p, which rescinded and superseded SSR 96-7p, eliminating the credibility finding at issue here. The ALJ issued his opinion on June 27, 2014, before SSR 16-3p took effect. The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting the Agency retroactive rulemaking power). Because the SSR does not have retroactive effect, the Court will review the ALJ's decision under SSR 96-7p.

conservative treatment, an ALJ is reasonable in holding that the alleged disability lacks the seriousness that the claimant alleges. *Dunn*, 607 F. App'x at 274-75. Similarly, noncompliance with a treatment regimen can indicate a claimant's lack of credibility as to the severity of the alleged symptoms, as well. *Id.* at 275-76. An ALJ may also properly "consider a claimant's daily activities in assessing the severity of a claimant's symptoms such as pain." *Ellis v. Colvin*, 2014 WL 2862703, at *11 (W.D. Va. June 24, 2014).

In this case, the ALJ concluded that one could reasonably expect Plaintiff's medically determinable impairments to cause her alleged symptoms; however, the ALJ diminished the credibility of Plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms. (R. at 54.) Ultimately, the ALJ diminished Plaintiff's credibility, because Plaintiff's statements lacked support from the objective medical findings and the conservative nature of her treatment history. (R. at 57.) The ALJ also found Plaintiff less credible due to her history of noncompliance and her admitted activities of daily living. (R. at 54, 57.) Substantial evidence supports the ALJ's credibility determination.

     i.    The Objective Medical Findings and Conservative Nature of Plaintiff's Treatment History Support the ALJ's Credibility Finding.

The objective medical findings and Plaintiff's conservative treatment history support the ALJ's credibility determination. This Court has recognized that "[t]here exists no bright-line rule between what constitutes 'conservative' versus 'radical' treatment." *Gill v. Astrue*, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012). However, an ALJ may properly classify taking prescription medication as "conservative treatment." *Johnson v. Colvin*, 2016 WL 1090667, at *13 (W.D. Va. Mar. 18, 2016) (additional citations omitted).

On January 10, 2011, Plaintiff underwent a successful right heart catherization and closure surgery of her patent foramen ovale. (R. at 535, 539-40.) Kapildeo Lotun, M.D.,

discharged Plaintiff the following day and instructed her to resume her medications and to take aspirin and Plavix. (R. at 539-41.) Dr. Lotun further instructed Plaintiff to lift no more than ten pounds for two days and to follow a heart healthy diet. (R. at 540.)

On September 21, 2011, Plaintiff presented to Nurse Davis with right upper lateral thigh pain and occasional corresponding muscle spasms. (R. at 901.) When she took it, Naproxen relieved Plaintiff's symptoms, and she denied any hip or knee pain or weakness. (R. at 901.) Nurse Davis opined that a leg strain had caused Plaintiff's pain, and she instructed Plaintiff to continue using Naproxen and apply heat and ice to her thigh. (R. at 901-02.)

On January 30, 2012, Plaintiff reported that she felt well, and she denied any chest pain or shortness of breath. (R. at 896.) Plaintiff's medications controlled her hypertension symptoms, and Nurse Davis instructed Plaintiff to continue her current medications. (R. at 897.)

On August 21, 2012, Plaintiff complained of bilateral leg swelling and foot pain. (R. at 884.) Rita Barrett, F.N.P., instructed Plaintiff to continue taking her current medications, increase potassium and decrease sugar in her diet, and follow up with cardiology. (R. at 885-86.)

On September 16, 2012, Plaintiff visited the emergency room for intermittent chest pain. (R. at 768.) Generally, Plaintiff could relieve her pain with Zantac, and Guo Phoenix, M.D., opined that her chest pain likely related to gastrointestinal issues. (R. at 768.) Plaintiff's chest x-ray revealed normal results, and she remained pain free throughout her hospital stay. (R. at 768-69.) Dr. Phoenix discharged Plaintiff with instructions to take fifteen daily medications. (R. at 768-69.)

On October 4, 2012, Plaintiff underwent cardiac catherization, which revealed no significant coronary artery disease, no renal artery stenosis, mild luminal irregularities and systemic hypertension. (R. at 969-70.) George W. Vetrovec, M.D., performed the procedure,

and Plaintiff thereafter denied chest pain or shortness of breath. (R. at 963.) Dr. Vetrovec discharged Plaintiff with instructions to continue her current medications, follow a heart healthy diet, exercise daily and follow up with her cardiologist. (R. at 964-65.)

On May 14, 2013, Plaintiff complained of a recurring left ear infection and facial pain, for which Michael Dawson, M.D., prescribed Bactrim. (R. at 861, 863.) Dr. Dawson noted Plaintiff's hypertension and diabetes mellitus, and instructed Plaintiff to continue taking her current medications. (R. at 862-63.) He further instructed Plaintiff to exercise and decrease her sugar intake. (R. at 863.) On March 28, 2014, Michele Donoghue, F.N.P., similarly noted Plaintiff's hypertension and diabetes mellitus, and instructed her to continue taking her medication, exercise and avoid simple sugars. (R. at 1037-40.)

Finally, at the conclusion of each of her examinations, Dr. Spencer instructed Plaintiff to exercise daily and comply with a low sodium, low fat, and low cholesterol diet. (R. at 713, 722, 726, 730, 739, 797.) These records from various medical providers demonstrate that medications continually managed Plaintiff's symptoms. Thus, the objective medical findings and conservative nature of Plaintiff's treatment history support the ALJ's credibility determination.

> ii.     Plaintiff's History of Noncompliance Supports the ALJ's Credibility Finding.

The ALJ found that Plaintiff experienced worsening symptoms when she failed to comply with her doctors' orders. (R. at 57.) A history of noncompliance with a treatment regimen can indicate a claimant's lack of credibility as to the severity of her alleged symptoms. *Dunn*, 607 F. App'x at 275-76. Plaintiff's documented history of noncompliance with her medications and with recommended lifestyle changes support the ALJ's credibility determination.

On November 23, 2009, Plaintiff acknowledged that she did not take her prescribed medications. (R. at 687.) On May 3, 2010, Plaintiff complained of bilateral ankle and feet swelling, but again admitted to noncompliance with her medications. (R. at 608.) Nurse Davis encouraged Plaintiff to continue her current medication, exercise and stay mindful of her diet. (R. at 609.) On August 26, 2010, Plaintiff presented with elevated blood pressure, and Nurse Davis again noted Plaintiff's long history of noncompliance. (R. at 598.)

On September 14, 2010, Plaintiff presented to the hospital with hypertensive urgency. (R. at 694.) Charles Oppong, M.D., noted Plaintiff's history of noncompliance, and discharged her with specific instructions to take her medications. (R. at 695.) Instead, Plaintiff returned to the hospital several days later with similar symptoms due to continued noncompliance. (R. at 696.) Dr. Oppong noted that Plaintiff's uncontrolled blood pressure resulted from her failure to take her medications as prescribed. (R. at 698.) Dr. Oppong discharged Plaintiff with instructions to comply with her medications and to follow a low sodium diet. (R. at 698.)

On January 24, 2011, Plaintiff had gained ten pounds and admitted to following a sedentary lifestyle, despite Dr. Spencer's instructions two months earlier to exercise and follow a healthy diet. (R. at 722, 723.) Dr. Spencer again instructed Plaintiff to exercise daily and follow a low fat, low cholesterol and low sodium diet. (R. at 726.) On September 12, 2011, Plaintiff had gained ten more pounds and confirmed her sedentary lifestyle with no exercise. (R. at 727.) Once again, Dr. Spencer instructed Plaintiff to exercise daily and improve her diet. (R. at 730.)

On November 30, 2011, Plaintiff reported that she had not exercised or watched her diet. (R. at 898.) Dr. Marcelin provided Plaintiff with information on following a diabetic diet and instructed her to continue her current medication. (R. at 899.)

On August 21, 2012, Plaintiff complained of bilateral swelling and pain in her feet. (R. at 884.) The week prior, Plaintiff underwent bloodwork, which revealed a potassium level of 3.3. (R. at 884.) Accordingly, Rita Barrett, F.N.P., encouraged Plaintiff to increase potassium in her diet. (R. at 886.) Less than one month later, however, Plaintiff's potassium level dropped to 2.7, indicating noncompliance. (R. at 763.) Dr. Mohamed thereafter provided Plaintiff with potassium chloride, both intravenously and orally. (R. at 763.)

On September 13, 2012, Nurse Davis noted Plaintiff's diabetes, prescribed Metformin and instructed Plaintiff to follow an appropriate diabetic diet. (R. at 881-83.) On March 26, 2013, Plaintiff denied checking her sugars as directed. (R. at 873.)

On April 4, 2013, Nurse Donoghue noted Plaintiff's hypertension and diabetes mellitus, and instructed Plaintiff to exercise and to avoid simple sugars, soft drinks and high calorie foods. (R. at 870-72.) On April 10, 2013, Plaintiff presented with severely elevated blood pressure, and Nurse Donoghue again instructed Plaintiff to exercise regularly and follow a healthy diet. (R. at 867, 869.) On June 27, 2013, Plaintiff had gained ten pounds and denied exercising. (R. at 794.) Plaintiff contemplated undergoing bariatric surgery for weight loss. (R. at 794.)

In addition to noncompliance aggravating her condition, the record reveals that Plaintiff's symptoms markedly improved when she did comply with her treatment regimen. On August 26, 2010, Plaintiff stated that compliance with her medications the previous two nights had alleviated her hypertension symptoms. (R. at 598.) Plaintiff also reported no chest pain or shortness of breath. (R. at 598.) On September 12, 2011, Plaintiff again indicated compliance with her medications. (R. at 727.) Plaintiff denied numbness or tingling as well as any tenderness or swelling of her lower extremities. (R. at 728, 730.)

On January 24, 2011, Plaintiff indicated her compliance with her medications. (R. at 723.) Dr. Spencer noted that Plaintiff had "been doing fairly well," and that her hypertension had "been fairly well controlled on [her] current medications." (R. at 723.) Plaintiff denied numbness or tingling, and denied any tenderness or swelling of her lower extremities. (R. at 725-26.) On November 30, 2011, Plaintiff's medications controlled her hypertension symptoms, and she reported no problems. (R. at 898-99.)

On September 13, 2012, Nurse Davis prescribed Metformin for Plaintiff to treat her diabetes. (R. at 881-83.) The record reveals several instances when Plaintiff presented for a refill on her medications, suggesting compliance. (R. at 853-55, 860, 875-78.) On October 2, 2012, Plaintiff had tolerated the Metformin without complaint and checked her sugars accordingly. (R. at 879.) At that time, Plaintiff's physical examination revealed normal findings. (R. at 879-81.)

On June 27, 2013, Plaintiff indicated compliance with her medications. (R. at 794.) Dr. Spencer noted Plaintiff as "doing fairly well." (R. at 794.) Plaintiff denied numbness, tingling, joint and muscle pain, and she denied any tenderness or swelling of her lower extremities. (R. at 796-97.)

Substantial evidence shows that Plaintiff's symptoms improved with medication compliance, but that Plaintiff overwhelmingly failed to take her medications as directed or comply with recommended lifestyle changes. Accordingly, Plaintiff's documented history of noncompliance supports the ALJ's credibility determination.

      iii.    Plaintiff's Admitted Activities of Daily Living Support the ALJ's Credibility Finding.

Plaintiff's admitted activities further support the ALJ's credibility determination. The ALJ may properly consider evidence of a claimant's daily activities "for determining the

intensity and persistence of pain symptoms and the extent to which those symptoms may limit

the claimant's capacity for work." *Phillips v. Astrue*, 2013 WL 485949, at *7 (W.D. Va. Feb. 5,

2013) (citing 20 C.F.R. § 404.1529(c)(3)(i)).  During the hearing on March 7, 2014, Plaintiff

testified that she could sit for an hour before she needed to stand again, and conversely, that she

could stand for an hour before she needed to sit.  (R. at 110.)  The ALJ accounted for Plaintiff's

apparent need to alternate between sitting and standing by including in the RFC that Plaintiff

"must be able to alternate between sitting and standing in place every thirty minutes."  (R. at 53.)

Plaintiff testified that she could prepare meals and clean the kitchen and bathroom, and she could

launder clothes and mop floors.  (R. at 113.)  Plaintiff could participate in activities with her son

"if [she was] feeling up to it."  (R. at 116.)  Plaintiff dined at restaurants and could attend the

movie theater twice per month.  (R. at 118-19.)  Plaintiff also testified that she shopped for

groceries and attended church monthly.  (R. at 119.)  Based on her own testimony, Plaintiff's

admitted daily activities support the ALJ's credibility determination.

The record fails to reveal any "exceptional circumstances" that would lead the Court to

disturb the ALJ's credibility determination.  *See Eldeco*, 132 F.3d at 1011 (quoting *NLRB*, 717

F.2d at 145 (concluding that "exceptional circumstances include cases where a credibility

determination is unreasonable, contradicts other findings of fact, or is based on an inadequate

reason or no reason at all.") (internal quotation marks and citation omitted)).  Consequently,

substantial evidence supports the ALJ's credibility determination.

### C. The ALJ Properly Considered Plaintiff's Obesity in her RFC Determination.

Finally, Plaintiff argues that the ALJ erred in failing to consider the impact of her obesity

on her RFC or on the severity of her impairments, and that the failure to do so constitutes

reversible error.  (Pl.'s Mem. at 23.)  Defendant responds that the ALJ properly considered

23

Plaintiff's obesity throughout the sequential evaluation process and captured all of her obesity-related limitations when making the RFC determination.  (Def.'s Mem. at 19-21.)

Although not an independent impairment in the listings, obesity "warrants consideration in conjunction with any related musculoskeletal, respiratory, or cardiovascular conditions." *Hazelwood v. Colvin*, 2014 WL 1911891, at *10 (E.D. Va. May 13, 2014); SSR 02-1p.  During the sequential analysis, the ALJ should "consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity."  SSR 02-1p.  The ALJ must consider the effects of a claimant's obesity combined with her other impairments; however, the ALJ must "not make assumptions about the severity or functional effects of obesity combined with other impairments."  *Id.*  Moreover, "as long as the ALJ based his determinations on sources that were aware of [the claimant]'s obesity, he satisfied this requirement."  *Hazelwood*, 2014 WL 1911891, at *10 (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (finding that "[b]ecause her doctors must also be viewed as aware of [Plaintiff]'s obvious obesity . . . the ALJ's adoption of their conclusions constitutes a satisfactory if indirect consideration of that condition.")).

Contrary to Plaintiff's assertion, the ALJ properly considered evidence of Plaintiff's obesity in making her RFC determination and in relation to the severity of Plaintiff's other impairments.  (R. at 51-57.)  At step two of the sequential analysis, the ALJ identified Plaintiff's obesity as a severe impairment, recognizing that it had "more than a minimal effect" on Plaintiff's ability to function.  (R. at 51.)  At step three, the ALJ recognized that Plaintiff's obesity "must be evaluated in conjunction with other related conditions," but found that in

conjunction with her other related conditions, Plaintiff's obesity did not rise to a level of severity to meet or medically equal the criteria of a listed impairment. (R. at 51-53.)

Next, the ALJ thoroughly considered Plaintiff's obesity during the assessment of Plaintiff's RFC and in relation to her other impairments. (R. at 53-57.) The ALJ specifically discussed Plaintiff's height and weight seven times in her opinion, noting that she stood at five feet and three inches tall and weighed between 275 and 307 pounds during the relevant period. (R. at 54-57.) The ALJ also discussed Plaintiff's admitted activities of daily living. (R. at 57.) She noted that doctors had classified Plaintiff as "morbidly obese," but also recognized that Plaintiff could tend to her daily activities without difficulty. (R. at 55, 57.)

Additionally, the ALJ recognized numerous physical examinations during which Plaintiff expressly denied chest pain, shortness of breath, joint pain, muscle weakness and fatigue. (R. at 55-57.) The ALJ did note, however, that Plaintiff experienced shortness of breath during exercise when she weighed 275 pounds. (R. at 56.) The ALJ also discussed Plaintiff's obesity in light of her documented hypertension, indicating her elevated blood pressure, but the absence of dizziness and numbness when she weighed 289.9 pounds. (R. at 56.) The ALJ noted numerous instances where Plaintiff's medication controlled her hypertension, and that Dr. Spencer had cleared Plaintiff for bariatric surgery from a cardiac standpoint. (R. at 55-57.)

Finally, the ALJ diminished Plaintiff's credibility with regard to the extent of her functional limitations, because her daily activities indicated less limitation than she alleged. (R. at 57.) The ALJ also diminished Plaintiff's credibility due to her noncompliance with medication and recommended lifestyle changes, as well as the conservative nature of Plaintiff's treatment history. (R. at 55-57.) Moreover, the ALJ recognized that Plaintiff's own treating physician, as well as other physicians and medical personnel, continually recommended a

25

healthy diet and regular exercise to Plaintiff.  (R. at 55-57.)  Further, in the RFC, the ALJ specifically included a more restrictive, alternating sit-stand accommodation than the hourly alternating schedule that Plaintiff testified that she required.  (R. at 53.)

Therefore, because the ALJ based her determinations on objective medical evidence in the record and discussed such evidence with reference to Plaintiff's obesity throughout the sequential analysis, the ALJ properly considered Plaintiff's obesity in her RFC determination. Substantial evidence supports the ALJ's decision.

<h3 style="text-align:center">V.   CONCLUSION</h3>

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) and Motion for Remand (ECF No. 8) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge John A. Gibney, Jr. and to all counsel of record.

<h3 style="text-align:center">NOTICE TO PARTIES</h3>

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

by the District Judge except upon grounds of plain error.

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  December 20, 2016